IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DEALER COMPUTER SERVICES, INC.,   }
F/K/A FORD DEALER COMPUTER   }
SERVICES, INC.   }
   }      CIVIL ACTION NO. H-06-175
VS.   }
   }
FORD MOTOR COMPANY   }

### ORDER DENYING PRELIMINARY INJUNCTION

Plaintiff Dealer Computer Services, Inc. (DCS) has brought antitrust claims against

Ford Motor Company (Ford), alleging violation of the Sherman Act, 15 U.S.C. Sec. 1, *et seq.*  This

Court has subject matter jurisdiction pursuant to 28 U.S.C. Sec. 1331; 15 U.S.C. sec 4.

DCS seeks a preliminary injunction against Ford, prohibiting Ford from withholding

its parts catalog data from DCS.    An evidentiary  hearing was held on the application for

preliminary injunction on March 9, 2006.  For the reasons expressed in this Order, the preliminary

injunction is DENIED.

DCS  provides an electronic parts catalog known as the Computerized Publication

Display (CPD) to Ford and Lincoln-Mercury dealers across the United States.  The CPD system

includes DCS's proprietary CPD software, customized hardware, support, and maintenance.  The

system is used on 8,247 workstations in the parts departments of 2,471 Ford and Lincoln-Mercury

dealers across the United States.  The gravamen of DCS's complaint concerns the monthly parts

catalog data subscription updates, which DCS has received from Ford pursuant to a ten year license

with Ford.  The parties agree that the parts data is the property of Ford and obtainable only from

Ford.  The ten year license expired by its own terms in September 2005.  DCS and Ford attempted

to negotiate a new licensing agreement, but DCS maintains that the terms of the new agreement proposed by Ford are too restrictive, are unreasonable, and will cause harm to its business.

Two other electronic parts catalog data providers, ProQuest and Infomedia (Microcat), compete with DCS. Like DCS, they receive data from Ford and provide electronic catalogs to Ford and Lincoln-Mercury dealers. Ford has offered them new licensing agreements on terms similar to those offered to DCS. One of the agreements is in place. Ford has announced its intentions to enter the electronic parts catalog data market itself, and DCS argues that the onerous conditions on renewal of the data licensing agreement, demanded by Ford, constitute an attempt to monopolize the electronic parts catalog data market and an attempt unlawfully to tie the license of parts catalog data to services, including software and software support.

The issuance of a preliminary injunction must be based on the applicant's satisfaction of four factors: (1) substantial likelihood of success on the merits; (2) substantial threat of irreparable injury or harm for which there is no adequate remedy at law; (3) threatened injury to the party seeking the injunction outweighs any harm that the injunction might cause to the party to be enjoined; (4) an injunction will not disserve the public interest. *Sugar Busters, LLC v. Brennan*, 177 F.3d 258, 264 (5th Cir. 1999).

At the March 9, 2006 hearing DCS attempted to show likelihood of success on the merits by focusing on the attempted monopolization claim. DCS provided no evidence or argument supporting its tying theory. DCS argued that it is likely to succeed on the merits because Ford's withholding of monthly updates of its parts catalog data from DCS is an attempt to monopolize the electronic parts catalog market by seeking to eliminate competition in what has been a competitive marketplace. Attempted monopolization is a violation of the antitrust laws. DCS called an expert witness, David Silbey, professor of economics, The University of Texas at Austin, to testify to Ford's antitrust violations.

DCS further argues that there is a substantial threat of injury or harm to it, for which there is no adequate remedy at law because without the parts catalog data updates DCS cannot fulfill its contractual obligations to provide accurate and usable data to thousands of Ford and Lincoln - Mercury dealers.  This data is critical to the service and repair operations performed by those dealers, who will suffer irreparable injury from the delays and errors in the repair and maintenance of Ford and Lincoln-Mercury vehicles.  The errors and delays will result in the dealers being unable to rely upon DCS to provide accurate and updated information about parts.  It is even possible, DCS maintains, that injury to unrelated consumers is threatened when the affected repaired and maintained vehicles enter the public roadways.   Without a preliminary injunction forcing Ford to share its updates with DCS, any decision of this court will be rendered meaningless because DCS will be forced out of the market.

DCS argues that all it wishes to do is preserve the *status quo* until trial.  The threatened injury to DCS far outweighs any harm to Ford because it has customarily provided the data for the past ten years.  Moreover, Ford will update and publish the data whether DCS receives it or not.  Ford stipulated at the hearing that it will go to no greater effort or expense to provide the data to DCS.

Finally DCS maintains that the injunction will not disserve the public interest because it will promote the public interest in competition and innovation, as well as by ensuring that Ford and Lincoln-Mercury dealers will continue to receive accurate, updated information.

Ford argues precisely the opposite.  It maintains that DCS does not have a substantial likelihood of success on the merits because even if Ford has attempted monopolization, which it does not, of course, concede, Ford has not engaged in predatory or anti-competitive conduct with a specific intent to monopolize and a dangerous probability of achieving monopoly power.

DCS brought forth two theories of likelihood of success on the merits.  The first is

the essential facilities doctrine, and the second is "refusal to deal," a doctrine developed in *Aspen*

*Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  The essential facilities doctrine

has been described by Judge Lake as "often criticized. . .[,but] nevertheless. . .a viable part of the

federal antitrust laws."  *The David L. Aldridge Company*, *et al. v. Microsoft Corporation*, 995 F.

Supp 728, 751 (S.D. Tex. 1998), *citing* IIIA  P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶ 771c,

at 176 (rev. ed. 1996).[1]  Judge Folsom was less charitable:

> The so-called "essential facility" doctrine is one of the most
> troublesome, incoherent and unmanageable of bases for Sherman
> Section 2 liability.  The antitrust world would almost certainly be a
> better place if it were jettisoned, with a little fine tuning of the
> general doctrine of the monopolist's refusal to deal to fill in the
> resulting gaps.

*Z-Tel Communications, Inc. v. SBC Communications, Inc.*, 331 F. Supp.2d 513, 540 (E.D. Tex.2004)
*quoting* Herbert Hovenkamp, *Federal Antitrust Policy, the Law of Competition and its Practice* 305
(2d ed. 1999).

The essential facilities doctrine requires, at a minimum, even before the analysis of

its factors, that there be a "facility."  As Judge Lake pointed out in *Aldridge,* "In the usual essential

facilities case the alleged facility is a conduit for the distribution of another product."  995 F. Supp.

at 752.  Judge Lake then lists the cases in which such facilities have been discussed:

> Sports stadiums facilitate the display of indoor sports.  *See Fishman*
> *v. Estate of Wirtz,* 807 F.2d 520, 532 (7th Cir. 1986); *Hecht v. Pro-*
> *Football, Inc.*, 570 F.2d 982, 989 (D.C. Cir. 1977).  Railroad bridges
> permit continuation of rail service and delivery of freight.  *See United*
> *States v. Terminal R.R. Ass'n,* 224 U.S. 383, 392-94 (1912).
> Telecommunications networks distribute information.  *See MCI*
> *Communications Corp. v. AT&T,* 708 F.2d 1081, 1093 (7th Cir. 1983).

---

[1]DCS argues that three judges of the Southern District of Texas have adopted the "essential
facilities doctrine."  It is more accurate to say that these judges addressed the doctrine in their
opinions, since none of the three found that the requirements of the doctrine had been met in each
of their cases.  *Aldridge,* 995 F.Supp. 728; *City of College Station, Texas v. City of Bryan, Texas,*
932 F.Supp. 877 (S.D. Tex. 1996) (Atlas, J.); *TCA Building Company v. Northwestern Resources*
*Co.,* 873 F.Supp. 29 (S.D. Tex. 1995) (Kent, J.).

> Ski mountains provide access to recreational skiing. *See Aspen
> Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1521
> (10th Cir. 1984), *aff'd on other grounds*, 472 U.S. 585 (1985).

*Id.*

Judge Lake goes on to point out,  "While Windows95 does facilitate the use of

application software, Cache86 is not such a product; it is a utility program designed to improve the

distributing product."  *Id.*  Similarly, in the instant case, what DCS is alleging as the "essential

facility" is the proprietary parts data of Ford Motor Company. Data It is not a conduit for the

distribution of anything. Rather, data requires a conduit for its distribution.  The electric parts

catalog, not the data, is a conduit.

If it is assumed for the purposes of argument, however, that the parts data could in

some way be viewed as a "facility," we must turn to the four part[2], or Judge Lake's six part, test for

an "essential facility," [3]  In order to win an "essential facility" case, DCS must prove:

> (1) the defendant is a monopolist

> (2) the facility is essential

> (3) the defendant has the type of control over the facility that is forbidden by the

Sherman Act.

> (4) duplication of the facility is unreasonable or impractical;

> (5) the defendant denied the plaintiff use of the facility; and

> (6)   providing access to the plaintiff was feasible.[4]

DCS has a problem with factor three.  "Obviously, every manufacturer has a natural

monopoly over the distribution of its products.  That monopoly, however, does not contravene the

---

[2] *Cf*. Judge Atlas's opinion in *City of College Station,* 932 F. Supp. at 887 (S.D.Tex. 1996)

[3] *Cf*. Judge Lake's opinion in *Aldridge*, 995 F. Supp. at 752, n.138.

[4] *Id.*

antitrust laws." *Sports Center, Inc. v. Riddell, Inc*., 673 F.2d 786, 791 (5th Cir. 1981). The product at issue in the instant case is automobile parts, not data about automobile parts. An electronic catalog for automobile parts merely facilitates the distribution of those automobile parts. The Sherman Act does not forbid a manufacturer of automobile parts from exercising monopolistic control over the manner in which it chooses to distribute those parts.

Judge Folsom, relying upon Professor Hovenkamp, *supra*, found in *Z-Tel*, "Essential facilities refers to a particular embodiment of the refusal to deal legal theory. Professor Hovenkamp explains that the logical foundation of the refusals to deal legal concept applies with persuasive force to the essential facilities concept." *Z-Tel*, 331 F. Supp. 2d at 540.

DCS's refusal to deal is based on its position that the negotiations for a new license agreement after the September 2005 expiration of the ten year license constituted a refusal to deal because the terms of the new contract, specifically Ford's insistence on a one year contract with a three year wind down period, were onerous and unreasonable and would eventually force all three current electronic parts catalog suppliers out of the business. DCS relies almost exclusively upon *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585 (1985). In that oft cited, but rarely applied, case Aspen Skiing Co. unilaterally terminated a profitable arrangement with its competitor Aspen Highlands Skiing Corp. to use a common lift ticket for the four mountains in the Aspen, Colorado area. Three of the mountains were owned by Aspen Skiing and one of the mountains by Aspen Highlands. The facts of the case established that there was no commercial reason for the termination of the arrangement, and that Aspen Skiing was attempting to monopolize skiing in Aspen. In discussing the plaintiff in *Z-Tel*, Judge Folsom opined, "Plaintiff bears a heavy doctrinal burden to capture *Aspen Skiing's* narrow exception." *Z-Tel*, 331 F. Supp. 2d 513, 539. This is undoubtedly because the Supreme Court recently stated, "*Aspen Skiing* is at or near the outer boundary of Section 2 liability." *Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko*,

50 U.S. 398, 409; (2004).  The Supreme Court in *Trinko* discussed *Aspen Skiing* and noted three

distinctive features of the facts in *Aspen Skiing* that made imposition of liability appropriate: (1) The

parties in *Aspen Skiing* had been engaged in a continuing cooperative arrangement that was

profitable for both.  *Trinko*, 540 U.S. 398, 409;  (2) Aspen Skiing Co. refused to continue the joint

marketing arrangement and took great pains to keep Aspen Highlands from providing its customers

with a substitute 4-mountain lift ticket, even going so far as to refuse to sell to Aspen Highlands the

Aspen Skiing Co. lift tickets at retail prices.  Such conduct, the Supreme Court noted, suggested that

Aspen Ski Co. was willing to forego short-term profits to achieve a long-term anticompetitive end.

*Aspen Skiing*, 472 U.S. 585, 606-607; and (3) Aspen Skiing offered no "normal business purpose"

for its conduct.

In the instant case the license agreement between Ford and DCS had an expiration

date.  It was not a "course of dealing," but a single agreement.  The parties had expressly

contemplated that their licensing relationship would end at a definite point.  Ford gave notice of the

termination, as contemplated by the contract, and began negotiations with DCS for a new contract.

The new contract was not acceptable to DCS, but its terms were not unreasonable.  An unacceptable

offer is not, by itself, a refusal to deal.  When DCS rejected the new contract and filed this lawsuit,

the licensing relationship between the parties was over.  Were this Court to grant DCS's preliminary

injunction, it would not be maintaining the *status quo*, but would be imposing upon the parties a new

licensing agreement.  The antitrust laws do not encourage courts to take such steps.  "Enforced

sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity,

and other terms of dealing–a role for which they are ill-suited."  *Trinko*, 540 U.S. 398, 408.

Ford is not making an unreasonable offer because it is not sacrificing short term

profits for long term anticompetitive gains.  The license fee charged by Ford to DCS was $100,000

per year.  Testimony at the preliminary injunction hearing revealed that DCS used the property Ford

licensed to DCS to make millions of dollars in revenue annually to distribute Ford's data on DCS's electronic parts catalogs.  During the negotiations for the new contract, however, Ford did not attempt to gain a higher licensing fee, but offered a minimum four year license (1 year contract plus three year wind down period) at exactly the same $100,000 annual fee.   Aspen Skiing Co., in contrast to Ford, acted against its own business interests in an effort to drive Aspen Highlands out of the skiing market.  The Supreme Court found that such seemingly  irrational business behavior pointed to Aspen Skiing Co's expectation that its actions would reap long-term reduction in competition.  Ford is not in the business of selling parts catalog data to consumers.  It sells automobiles and replacement parts for its vehicles, through Ford-franchised dealerships.  It competes against others who manufacture parts that car owners purchase. Electronic parts catalogs are but a tool used by the dealers to sell automobile parts and service.

Unlike Aspen Skiing Co., Ford has a legitimate business reason for its conduct.  John L. Sullivan, Global Quality and Service Manager for Ford, testified at the hearing that Ford's decision to provide its own electronic parts catalog is nothing more than an attempt to provide actual parts at a lower cost to its dealers so that dealers can compete against other sources of parts that car owners require.  He also testified that the circumstances of 1995, which led Ford to licensing its parts data to DCS, is very different from the situation in 2005, when it began its negotiations for a new contract.  A ten year contract in 1995 was advantageous to Ford as well as to DCS, but in 2005, with all of the developments in the utilization of computer technology, short term contracts are more advantageous to Ford.  There is nothing unusual or economically irrational about this fact, and the antitrust laws do not require a businessman to offer to enter into a long term contract when a short term one is to his advantage.

-9-

DCS has not established that it has a substantial likelihood of success on the merits of its antitrust claims against Ford.  For that reason, its Motion for Preliminary Injunction is hereby DENIED.

SIGNED at Houston, Texas, this 28th day of March, 2006.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE